COURT OF 
APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-162-CR
  
  
RAUL 
FERNANDO MENDOZA                                                  APPELLANT
  
V.
  
THE 
STATE OF TEXAS                                                                  STATE
 
  
------------
 
FROM 
THE 211TH DISTRICT COURT OF DENTON COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
        A 
jury convicted Appellant Raul Fernando Mendoza of murder and assessed his 
punishment at thirty-five years’ confinement in the Institutional Division of 
the Texas Department of Criminal Justice. The trial court sentenced him 
accordingly. In four issues, Appellant (1) contends that the trial court erred 
by denying his motion to suppress, (2) challenges the legal and factual 
sufficiency of the evidence, and (3) argues that he was denied effective 
assistance of counsel at trial. Because we hold that the evidence is both 
legally and factually sufficient, that the trial court did not reversibly err, 
and that Appellant failed to prove his ineffective assistance claim, we affirm 
the trial court’s judgment.
Statement of 
Facts
        Appellant 
and the complainant, Erika Gonzalez, were living together with Appellant’s 
parents in Lewisville. On January 10, 2003, Appellant and Erika argued about 
Erika’s cheating with her estranged husband. Appellant claimed that, following 
the argument, while he was getting a glass of water on the first floor, Erika 
became unconscious while in the bathtub on the second floor. Appellant called 
911, and Officer Nadia Ebeid was dispatched to Appellant’s house, where she 
spoke with him. Detective Eddie Barrett also interviewed Appellant at the house 
and obtained an oral statement from him. When the paramedics arrived, Erika was 
still unconscious. Detective Javier Carcano obtained written consent from 
Appellant and his parents to search the house. Detective Carcano then drove 
Appellant to the Lewisville Police Department, where Appellant provided a 
written statement. After providing the statement, Appellant was initially 
arrested for suspicion of aggravated assault. Erika died the following day, and 
it was determined that her death was caused by compression of the chest and/or 
strangulation. Appellant was then booked in and charged with Erika’s murder.
Motion to 
Suppress
        In 
his first issue, Appellant argues that the trial court erred by denying his 
motion to suppress his statements, which he contends that the police obtained 
“in violation of his Fourth and Fifth Amendment rights to the United States 
and Texas Constitutions.” Appellant gave statements to Officer Ebeid and to 
Detectives Barrett and Carcano. Appellant’s motion to suppress was heard after 
the trial had begun.
        Officer 
Ebeid testified before the jury prior to the hearing on Appellant’s motion to 
suppress. Her testimony included conversations with Appellant about what might 
have happened to Erika. The sole objection Appellant made to Officer Ebeid’s 
testimony regarding the conversation that she had with Appellant was that the 
testimony was hearsay. Appellant did not object that the statement was 
involuntary or that it was a custodial statement given without benefit of Miranda[2] warnings. Thus, he has failed to preserve his complaint as 
to statements he made to Officer Ebeid.[3]
        The 
State introduced Appellant’s written statement into evidence through Detective 
Carcano. Detective Carcano testified that Appellant’s written statement was 
made voluntarily after Appellant had been informed of and had waived his Miranda 
rights. Although Appellant made oral statements during the time that he was 
drafting his written statement, the State did not attempt to offer the oral 
statements. After Detective Carcano testified at the suppression hearing, 
defense counsel stated to the court that he did not object to the admission of 
the written statement but that any previous oral statement should be suppressed. 
Later, before the jury, Appellant specifically stated that he had no objection 
when the State offered the written statement into evidence. Appellant, 
therefore, has failed to preserve any complaint regarding his written statement.[4]
        We 
agree with the State that the true issue before the court is whether the oral 
statements to Detective Barrett should have been suppressed. We employ a 
bifurcated standard of review, giving almost total deference to the trial 
court’s determination of historical facts and reviewing de novo the trial 
court’s application of the law to those facts.[5]
        Detective 
Barrett testified as follows outside the jury’s presence about Appellant’s 
oral statements to him at the crime scene:
  
Q. And what did he say to you?
 
A. 
He said that he was – he and Erika were living together at the home in the 
upstairs bedroom; that they had had an argument; that after the argument he went 
downstairs and — to get a glass of water; that he was down for a few minutes, 
went back up, and he found Erika in the bathtub not breathing.
 
Q. 
Okay. And did he say anything else to you there at the scene?
 
A. 
He — when I asked him, “Well, what do you think happened to her?”, he said 
that she might have taken something. He said the argument was over — they were 
at a bar the night before, and she had left him. And when they — when they got 
up, they had an argument about it. And then she had told him that he — she was 
sleeping with her estranged husband.
 
 
Detective 
Barrett testified that he did not consider Appellant free to leave at the time 
that he provided a statement because Appellant had become a suspect and was 
subject to investigative detention. Detective Barrett did not inform Appellant, 
however, that he was not free to leave. The officer’s subjective view of a 
defendant’s freedom to leave is not determinative of the question of whether 
the defendant was detained.[6]
        We 
look, therefore, to all the factors concerning Appellant’s discussion of the 
facts surrounding Erika’s death.[7]  Appellant 
called 911 to report that Erika was not breathing. It therefore was objectively 
reasonable that emergency and law enforcement personnel would appear at his 
residence to investigate. It was also objectively reasonable that police would 
seek to discuss with Appellant the circumstances surrounding Erika’s having 
stopped breathing. The discussions with Detective Barrett took place in 
Appellant’s front yard, and although Detective Barrett did not advise 
Appellant of all of his constitutional rights, he did advise Appellant that he 
did not have to answer his questions. Earlier, Appellant had walked off while 
Officer Ebeid was talking to him.
        The 
police asked Appellant whether he was willing to go to the police station to 
give a statement. They asked his mother and stepfather to go as well. Although 
the police transported Appellant to the police station, the record reflects no 
threats that he would be taken forcibly if he refused to go voluntarily. Case 
law suggests that the mere fact that the officers provided transportation is not 
conclusive evidence that the individual is in custody.[8]  
We conclude that the record before this court does not reflect any circumstances 
that would cause an objective and reasonable person in Appellant’s position to 
believe that his freedom of movement had been restricted to the degree that he 
was not free to leave.
        Additionally, 
we note that the only new evidence provided by Detective Barrett’s testimony 
about Appellant’s oral statements was that Appellant and Erika had been 
involved in an argument at the bar the evening before and that Erika had left 
him that evening. Officer Ebeid had already testified that the reason for the 
argument was Erika’s admission to Appellant that she had cheated on him with 
her estranged husband and that Appellant claimed that he had gone downstairs to 
get a glass of water and had found Erika unconscious in the bathtub when he 
returned upstairs.
        Based 
on the record before this court, we hold that the trial court did not err by 
admitting Appellant’s oral statements made to Detective Barrett. Because we 
have upheld the admission of all of Appellant’s challenged statements, we 
overrule Appellant’s first issue.
Legal and 
Factual Sufficiency of the Evidence
        In 
his second and third issues, Appellant challenges, respectively, the legal and 
factual sufficiency of the evidence supporting his conviction.
        Erika’s 
sister Yolanda Gonzales testified that on January 10, 2003, she received a phone 
call from Appellant. Appellant told her that he and Erika had gotten into a 
fight and that Erika had told him that she was cheating on him. According to 
Appellant, Erika had committed suicide. He claimed that after he and Erika had 
fought, he left her in the bathroom and went downstairs, but that when he went 
back upstairs, he found her in the bathtub, and she was blue.
        Anthony 
Castille, a neighborhood friend of Appellant, testified that on January 10, 
2003, Appellant had come to his door looking sad and upset, saying that his 
girlfriend was not breathing and that he needed to get help. Castille and his 
brother went to Appellant’s house and found Erika unconscious, lying in a 
bathtub in less than a foot of water. During this time, Appellant was talking to 
the 911 operator who instructed the men to lift Erika out of the tub and to 
begin CPR. The men followed the instructions, and when paramedics arrived, they 
took over the CPR.
        Castille 
noticed marks on Erika’s neck and thought it looked as though she had been 
choked. His brother, however, thought the marks looked like hickeys. Detective 
Barrett took photographs of Erika. The photographs showed marks on her neck and 
petechiae (a collection of small bruises that look like purplish red dots) on 
her shoulders and face.
        Officer 
Ebeid and Detective Barrett testified about their conversations with Appellant. 
Appellant suggested to Detective Barrett that “maybe she took something.” 
Appellant, his mother, and his stepfather consented to the police searching the 
house. Detective Barrett did not find any prescription medication or narcotics 
that Erika could have taken, nor was there any sign of forced entry into the 
house.
        The 
evening before, Erika had been drinking tequila. She told Appellant that she 
missed her parents and wanted to be with them. The next morning, Erika went to 
the bathroom. She let the bathtub fill up halfway and then went back to the 
bedroom and told Appellant that she had been going out with a man and that they 
had had sex once. Appellant called her a bitch, and Erika tried to slap him, but 
Appellant blocked her hand. Appellant claimed that he hugged Erika to keep her 
from slapping him again. He described the hug as
   
real hard around her right arm against her neck. My arm, right arm[,] was 
holding her right arm against her neck. Her left arm was trying to hit me. And 
my left arm was holding her to calm[] her down and holding her right arm to and 
then I said that she had to calm down and she said ok. Then she tried again to 
hit me and I hugged her again and told her I was going to take her to the 
restroom and let her calm down and I carried her to the restroom, so I did take 
her to the restroom and put her in front of the bathtub. I told her that she had 
to calm down. She did not say nothing so I let go of her and went out of the 
restroom and closed the restroom door and went downstairs.
 
        The 
director of emergency medicine at The Medical Center of Lewisville, Dr. Stewart 
Coffman, was the attending physician when Erika was admitted. He testified that 
Erika was unresponsive to stimuli, had no voluntary movement, was unable to 
breathe on her own, and had very low blood pressure. She was suffering from a 
lack of oxygen flow, that is a lack of blood flow, to the brain. Dr. Coffman 
noticed the petechiae across her shoulders and face. The pattern of petechiae, 
according to Dr. Coffman, suggested that Erika had been placed in a chokehold or 
a stranglehold. Dr. Coffman testified that the strangulation did not appear to 
be the result of a grip around the neck or a noose or any type of ligature but 
was more consistent with an arm chokehold. In his opinion, the lack of oxygen 
flow to the brain was caused by the strangulation. Dr. Coffman testified that to 
cause the brain injury sustained by Erika, the flow of oxygen would have been 
cut off for approximately six continuous minutes. In his opinion, suicide was 
not a possibility because a person would become unconscious before enough time 
would elapse to cause death.
        Parkland 
Memorial Hospital trauma surgeon Dr. Brian Eastridge testified that when Erika 
arrived at Parkland from the Lewisville hospital, she was unresponsive and that 
he noticed a multitude of petechial hemorrhages on her upper chest, face, and 
neck. The petechiae from the neck up were consistent with strangulation by a 
chokehold. The existence of petechiae on the chest and shoulders was consistent 
with pressure across her thorax or chest and could occur from someone holding 
her over a bathtub but not from someone simply lying her across the bathtub. Dr. 
Eastridge also observed abrasions on the outside of Erika’s neck. He agreed 
that the brain injury that he observed was consistent with oxygen deprivation 
for about six minutes. He also testified that the petechiae in Erika’s case 
were consistent with traumatic asphyxia or a lack of blood flow back to the 
heart.
        Dr. 
Walter Kemp, an adjunct medical examiner who conducted the autopsy, testified 
that he observed multiple petechial hemorrhages around Erika’s eyes. This 
condition was consistent with strangulation. Petechiae on Erika’s face and in 
a line on her shoulders and upper chest were consistent with significant 
compression of the chest. In his opinion, a person’s body weight would not 
generate a sufficient force to cause such compression. Erika’s sphenoid sinus 
cavity contained water, indicating that her head was underwater at some point. 
He also observed cerebral edema, indicating to him that the brain was 
continuously deprived of oxygen for a significant amount of time, three or four 
minutes at a minimum. Dr. Kemp also observed a bruise on the right side of 
Erika’s neck. He listed “homicidal violence” as the manner of death. Dr. 
Kemp concluded, based on the autopsy finding and the history available to him, 
that Erika died of asphyxia and that drowning may have contributed to her death. 
Castille, the neighbor who saw Erika in the bathtub, testified that her head was 
near the nozzle and that her hair was wet. Again, the record reflects that there 
was less than a foot of water in the tub.
        Applying 
the appropriate standards of review for both legal[9] 
and factual[10] sufficiency, we hold that the 
evidence is sufficient to support a jury’s determination that with the intent 
either to cause the death of Erika or to cause serious bodily injury while 
committing an act or acts clearly dangerous to human life, Appellant caused 
Erika’s death. We overrule Appellant’s second and third issues.
Ineffective 
Assistance of Counsel
        In 
his fourth issue, Appellant argues that he was denied effective assistance of 
counsel because his trial counsel failed to (1) prepare adequately for trial; 
(2) object to the prosecutor’s opening statement; (3) request a limiting 
instruction pertaining to an answer giving by Erika’s sister; (4) 
cross-examine the 911 operator; (5) cross-examine extensively the paramedic who 
testified; (6) file a written motion to suppress rather than an oral motion; and 
(7) request a jury charge on the lesser included offense of manslaughter.
        We 
note that an oral motion to suppress is usually sufficient[11] 
and generally not an indication of inadequate performance. Regarding trial 
counsel’s failure to request a jury instruction on manslaughter, we note that 
there is no evidence to support an instruction on the lesser included offense of 
manslaughter because there is no evidence that Appellant behaved recklessly in 
causing Erika’s death. Finally, as to the other allegations of inadequate 
performance by trial counsel, Appellant’s motion for new trial alleged only 
that the verdict was contrary to the law and the evidence. No affidavits were 
attached, and the motion was denied without a hearing by operation of law. 
Consequently, the record does not reveal the bases for the remaining challenged 
actions and omissions of trial counsel. This court will not “reverse a 
conviction on ineffective assistance of counsel grounds when counsel's actions 
or omissions may have been based upon tactical decisions, but the record 
contains no specific explanation for counsel's decisions.”[12]  
Accordingly, based upon the applicable standard of review,[13] 
we overrule Appellant’s fourth issue.
Conclusion
        Having 
overruled Appellant’s four issues, we affirm the trial court’s judgment.
  
  
                                                                  LEE 
ANN DAUPHINOT
                                                                  JUSTICE
   
 
PANEL 
A:   LIVINGSTON, DAUPHINOT, and WALKER, JJ.
 
DO 
NOT PUBLISH
Tex. R. App. P. 47.2(b)
 
DELIVERED: 
July 28, 2005


NOTES
1. 
See Tex. R. App. P. 47.4.
2. 
Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).
3. 
See Tex. R. App. P. 
33.1(a); Mendez v. State, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004); 
Mosley v. State, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied, 526 U.S. 1070 (1999).
4. 
See Tex. R. App. P. 
33.1(a); Mendez, 138 S.W.3d at 341; Mosley, 983 S.W.2d at 265.
5. 
Maxwell v. State, 73 S.W.3d 278, 281 (Tex. Crim. App.), cert. denied, 
537 U.S. 1051 (2002).
6. 
Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996).
7. 
See id.
8. 
Anderson v. State, 932 S.W.2d 502, 505 (Tex. Crim. App. 1996), cert. 
denied, 521 U.S. 1122 (1997).
9. 
See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Burden 
v. State, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001); Dewberry v. State, 
4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 
(2000).
10. 
See Zuniga v. State, 144 S.W.3d 477, 481-82, 484-87 (Tex. Crim. App. 
2004); Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003); Cain 
v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).
11. 
See, e.g., Wilkerson v. State, 144 S.W.3d 150, 152 (Tex. 
App.—Fort Worth 2004, pet. ref’d & pet. granted).
12. 
Bone v. State, 77 S.W.3d 828, 830 (Tex. Crim. App. 2002).
13. 
See Strickland v. Washington, 466 U.S. 668, 687-90, 694, 104 S. Ct. 2052, 
2064-66, 2068 (1984); Thompson v. State, 9 S.W.3d 808, 812-14 (Tex. Crim. 
App. 1999).